**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
GEIGTECH EAST BAY LLC,                          :

                Plaintiff,                    :

            v.                               :

LUTRON ELECTRONICS CO., INC.                    :

                Defendant.                    :    No. 1:20-CV-10195-CM

-------------------------------------------------------------                :    ECF Case

LUTRON ELECTRONICS CO., INC.,                   :

              Counterclaim-Plaintiff,         :

            v.                               :

GEIGTECH EAST BAY LLC,                          :

              Counterclaim-Defendant.         :
-------------------------------------------------------------x

**DEFENDANT LUTRON ELECTRONICS CO., INC.'S**
**MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFF'S SECOND MOTION FOR PRELIMINARY INJUNCTION**

ARNOLD & PORTER KAYE SCHOLER LLP
James D. Herschlein
Paul C. Llewellyn
250 West 55th Street
New York, NY 10019-9710
T: 212.836.8000
F: 212.836.8689
james.herschlein@arnoldporter.com
paul.llewellyn@arnoldporter.com

CARTER ARNETT PLLC
Scott W. Breedlove
Minghui Yang (pro hac vice forthcoming)
8150 North Central Expressway, Suite 500
Dallas, TX 75206
T: 214.550.8188
F: 214.550.8185
sbreedlove@carterarnett.com
myang@carterarnett.com

HUGHES HUBBARD & REED LLP
James W. Dabney
Michael M. Polka
One Battery Park Plaza
New York, NY 10004-1482
T: 212.837.6803
F: 212.299.6803
james.dabney@hugheshubbard.com
michael.polka@hugheshubbard.com

**ATTORNEYS FOR DEFENDANT**
**LUTRON ELECTRONICS CO., INC.**

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL BACKGROUND ............................................................................... 2

    A.    Lutron's Palladiom Shading System Is a Superior, Multi-Faceted System............ 2

    B.    GeigTech Re-Invented the Alleged "Invention" During Prosecution. .................. 6

    C.    Geiger's Patent Application Was Grounded in Fraud from the Beginning. .......... 11

III.  ARGUMENT ..................................................................................................... 15

    A.    GeigTech Has Failed to Establish That It Is Likely to Succeed on the Merits ................................................................................................... 16

        1.    GeigTech's Claim Is Barred by Intervening Adverse Rights. ................. 16

        2.    The Asserted '872 Patent Claims Are Anticipated and Invalid............... 19

        3.    The '872 Patent Is Invalid for Failure to Name All Inventors. ................ 20

        4.    GeigTech Has Failed to Show Infringement. ........................................... 21

    B.    GeigTech Has an Adequate Monetary Remedy.................................................... 23

    C.    The Balance of Hardships Favors Denial of GeigTech's Motion......................... 24

    D.    The Public Interest Favors Denial of GeigTech's Motion.................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Altana Pharma AG v. Teva Pharms. USA, Inc.*,
    566 F.3d 999 (Fed. Cir. 2009)................................................................................. 20, 21

*Ashley v. Samuel C. Tatum Co.*,
    240 F. 979 (S.D.N.Y. 1917).......................................................................................... 17

*Autogiro Co. of Am. v. United States*,
    384 F.2d 391 (Ct. Cl. 1967)........................................................................................... 21

*Beacon Theatres, Inc. v. Westover*,
    359 U.S. 500 (1959)...................................................................................................... 23

*Cancer Research Tech. Ltd. v. Barr Labs.*,
    625 F.3d 724 (Fed. Cir. 2010)................................................................................. 17, 18

*Carlton v. Bokee*,
    84 U.S. (17 Wall.) 463 (1872) ................................................................................ 16, 18

*Citibank, N.A. v. Citytrust*,
    756 F.2d 273 (2d Cir. 1985).......................................................................................... 2

*Crown Cork & Seal Co. v. Ferdinand Gutmann Co.*,
    304 U.S. 159 (1938)...................................................................................................... 18

*Egenera, Inc. v. Cisco Sys., Inc.*,
    972 F.3d 1367 (Fed. Cir. 2020)..................................................................................... 20

*Marine Polymer Techs., Inc. v. Hemcon, Inc.*,
    672 F.3d  (Fed. Cir. 2012)............................................................................................ 18

*Gen. Talking Pictures Corp. v. W. Elec. Co.*,
    304 U.S. 175 (1938).................................................................................................. 17, 18

*Ives v. Sargent*,
    119 U.S. 652 (1887)...................................................................................................... 17

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007)...................................................................................................... 20

*Mach. Co. v. Murphy*,
    97 U.S. 120 (1877).................................................................................................. 21, 22

*Mackay Radio & Tel. Co. v. Radio Corp. of Am.*,
    306 U.S. 86 (1939)........................................................................................................ 22

*Mahn v. Harwood*,
    112 U.S. 354 (1884)...................................................................................................... 19

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997)...................................................................................................... 15

*Nat'l Water Meter Co. v. Yonkers Water Comm'rs*,
    149 U.S. 48 (1893)........................................................................................................ 22

*Otis Elevator Co. v. Atl. Elevator Co.*,
    47 F.2d 545 (2d Cir. 1934)............................................................................................ 17

*Park Ridge Sports, Inc. v. Park Ridge Travel Falcons*,
    No. 20 C 2244, 2020 WL 6265133 (N.D. Ill. Aug. 20, 2020).......................................... 2

*South Corp. v. United States*,
    690 F.2d 1368 (Fed. Cir. 1982)..................................................................................... 21

# TABLE OF AUTHORITIES
## Cont'd

**Cases**                                                                                    **Page(s)**

*Stanley Works v. C. S. Mersick Co.,*
    34 F. Supp. 914 (D. Conn. 1940) ........................................................................ 17

*Symbol Techs., Inc. v. Lemelson Med. Educ. & Research Found. LP,*
    422 F.3d 1378 (Fed. Cir. 2005) .................................................................. 17, 18

*Warner-Jenkinson Co. v. Hilton-Davis Chem. Co.,*
    520 U.S. 17 (1997) ...................................................................................... 21, 22

*Warnervision Ent'mt Inc. v. Empire of Carolina, Inc.,*
    101 F.3d 259 (2d Cir. 1996) ................................................................................ 24

*Weber Elec. Co. v. E.H. Freeman Elec. Co.,*
    256 U.S. 668 (1921) ........................................................................................... 22

*Webster Elec. Co. v. Splitdorf Elec. Co.,*
    264 U.S. 463 (1924) ...................................................................................... 17, 19

*Westinghouse v. Boyden Power Brake Co.,*
    170 U.S. 537 (1898) ...................................................................................... 21, 22

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) .......................................................................................... 15, 16

*Wollensack v. Reiher,*
    115 U.S. 96 (1885) ............................................................................................. 19

**Statutes**

35 U.S.C. § 102 ............................................................................................... 17, 19

35 U.S.C. § 103 ...................................................................................................... 20

35 U.S.C. § 112 .................................................................................................. 9, 19

35 U.S.C. § 283 ...................................................................................................... 16

35 U.S.C. § 284 ............................................................................................... 22, 23

35 U.S.C. § 307(b) ................................................................................................. 18

**Other Authorities**

11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2498 (2d ed. 1995) ... 15

Lutron Electronics Co., Inc. ("Lutron") respectfully submits this memorandum of law in opposition to GeigTech East Bay LLC's ("GeigTech") second motion for a preliminary injunction (Dkt. 20).[1]

## I.    INTRODUCTION

More than two years after its first failed attempt, GeigTech relies on a bracket patent to seek the same emergency injunction it sought in 2018 to stop its so-called "only competitor" (Dkt. 21 at 1) from competing. But this time is different, GeigTech insists. Indeed it is. For this time, GeigTech's new weapon is a patent that it did not even *apply* for until April 2019—*a year-and-a-half **after** James Geiger witnessed the launch of the Lutron Palladiom Shading System.*

The extraordinary remedy of a preliminary injunction would be inequitable and unprecedented in these circumstances, where James Geiger has attempted to redefine his purported 2012 "invention" years after seeing Lutron's superior 2017 design. Under long-established precedent, Lutron's intervening adverse rights trump every one of GeigTech's arguments.

Moreover, as evidenced below, the Palladiom brackets at issue are fundamentally different from what Geiger claimed was his invention. These Palladiom brackets are actually similar in appearance to a prior *Lutron* design idea that Geiger was given access to long before his alleged invention. Notwithstanding what he has represented to the United States Patent and Trademark Office (PTO) repeatedly, Geiger's alleged invention was simply a bracket milled to meet the design ideas and requirements of architect Matthew Taylor, who was never told of Geiger and Geig-Tech's patent applications and whose sworn statement accompanies this brief. And what GeigTech calls an "invention" is nothing of the sort. Rather, it is re-use of roller shade brackets from the 1920's, which were and are suitable for supporting electrically powered shades as the declaration

---

[1] This is GeigTech's second motion for preliminary injunction in GeigTech's larger litigation campaign against Lutron, including at least Case No. 18-5290 ("Case 1") and Case No. 19-4693 ("Case 2"). Lutron also refers to the accompanying Declaration of Dr. Eric H. Maslen, Declaration of Dr. Daniel H. Kruger, Declaration of Michael F. Smith, Declaration of Margaret A. Block, Declaration of James D. Herschlein (attaching Declaration of C. Matthew Taylor, "Taylor Decl."), and Declaration of Glen R. Farbanish. Finally, Lutron refers to documents previously filed on the Court's docket ("Dkt.") in Case 1 and Case 2.

of Dr. Maslen and accompanying animations of Drs. Maslen and Kruger show, explain, and illustrate.

Finally, the real risk of harm here is to Lutron, its network of dealers, and future users of the Palladiom Shading System, including those who choose Lutron's system for a host of reasons unrelated to the accused bracket features. GeigTech's new CEO has not begun to make a competent case for future irreparable harm to GeigTech, as the declaration of Dr. Meyer demonstrates. GeigTech's own conduct—waiting nine months to file Case 1, withdrawing the first patent count from Case 1, waiting years to apply for the new patent-in-suit, failing to seek preliminary injunction in Case 2, and stipulating to a stay of all litigation just a few months ago—is at irreconcilable odds with its latest theory of irreparable harm in this Case 3. "Certainly, delay does not support an attorney's claim that there is some sort of impending irreparable harm or an emergency of any sort. That's just common sense, as court after court has found."[2]

## II.    FACTUAL BACKGROUND

### A.    Lutron's Palladiom Shading System Is a Superior, Multi-Faceted System.

As seen in the Palladiom Shading System brochure from October **2017**, the Lutron system was "engineered to be beautiful": "For the first time, the elegant visual language and nearly limitless potential of our gracefully slim keypads and thermostats are available in a shading solution." Block Decl. Ex. 2 ("Palladiom Brochure") at 1–2.

Evident from the photo below, the Palladiom end bracket designed by Lutron uses the classic L-shape, which Lutron brackets have always used, defined by the foot (the base of the "L") that protrudes and is used to secure the structure to a support surface—i.e., a wall or ceiling:

---

[2] *Park Ridge Sports, Inc. v. Park Ridge Travel Falcons*, No. 20 C 2244, 2020 WL 6265133, at *11 (N.D. Ill. Aug. 20, 2020) (collecting cases from multiple circuits, including *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985)).



Excerpted from Palladiom Brochure, © 2017. Block Decl. Ex. 2

Because of the foot and its support, wire management is simplified and the remainder of the bracket can be especially thin, which is important in many installations to minimize the "light gap" between the window jamb and the shade fabric. Declaration of Dr. Eric H. Maslen at 17.

From its pre-2016 beginning, Lutron's product development effort for the Palladiom Shading System was driven by customer feedback and a recognition of emerging market trends—not just in window treatments, but across the luxury residential market segment—towards exposed hardware in equipment for buildings. Case 1, Dkt. 116 ("Laverty Decl.") ¶ 5; *see also* Case 1, Dkt. 119 at 5 (noting Lutron dealer feedback about the market for "custom decorative hardware"). During the research-and-development process, Lutron considered numerous competitive products[3] (a) in order to surpass them and (b) to better ensure there would be no violations of a competitor's patents in the field. Laverty Decl. ¶ 5; *see also* Dkt. 32 at 6–7 (highlighting a figure from a Geig-Tech patent in Lutron's CAD files). GeigTech's accusation that Lutron somehow "copied" the alleged "invention" disclosed in the '821 patent is categorically denied (*see* Dkt. 25 ¶ 53) and

---

[3] *Cf.* Case 1, Dkt. 119 at 9 (highlighting internal Lutron documents confirming Lutron intended to create a new design of exposed, decorative shades and brackets to compete with Hunter Douglas, Crestron, J. Geiger, and "[n]early all of our competitors").

belied by, among many other things, Lutron's enormous investment in developing its proprietary brackets, the integrated nature of the Palladiom Shading System as a whole, and a comparison of Lutron's Palladiom brackets (without the decorative ring and the foot cover) to figures in U.S. Patent No. 9,237,821 (the "'821 patent"):

| Lutron Palladiom End Bracket | '821 Patent Fastening Device |
|---|---|
|  | |

Lutron certainly adopted the idea of exposed, decorative brackets, but that idea well predated Geig-Tech's brackets, including in earlier Lutron designs, such as the following:




*See* Case 1, Dkt. 119 at 4–5 (confirming that the Lutron image on the left was sent to James Geiger in 2010, before his alleged invention); *see also* Taylor Decl. ¶ 20 (corroborating that Geiger himself acknowledged on December 15, 2010 that he had seen this Lutron design idea).

The Palladiom Shading System is the result of an enormous and costly engineering effort at Lutron and consists of an integrated system of elements including roller tubes with attached fabric, bottom rails (called hembars), mounting brackets, sensors, motors, and power supplies, selected and designed to work together. Laverty Decl. ¶ 4; Block Decl. ¶ 6; *see also id.* ¶ 8; Case

1, Dkt. 119 at 6 (detailing the financial cost of the product development effort). Each element has been touted heavily in advertising since the launch in 2017. *See, e.g.*, Palladiom Brochure at 8, 11, 15, 16 (the motor: "the quietest in the industry . . . all but imperceptible"; the tube: "startlingly slim . . . high-tech carbon fiber wonder . . . remarkably rigid, yet light as a feather"; the hembar: "slender, carefully balanced . . . ensures a balanced aesthetic . . . features Lutron patented Intelligent Hembar Alignment"; the brackets: "combine superior workmanship with ingeniously hidden electronics . . . bracket rings can slide open to reveal the programming buttons and indicator LEDs"). In addition to these features, Palladiom shades are made to install intuitively by sliding into Lutron's proprietary brackets from the front (patent pending), where the decorative ring can then rotate to hide buttons and parts, as depicted below (*see* Palladiom Brochure at 16):



Palladiom Shading System products have won prestigious awards and are positioned at the top of Lutron's window shading product range. Block Decl. ¶¶ 5, 9. These Palladiom products are priced higher than other Lutron window shade products and are sold through select dealers who make necessary investments in training and product support. Smith Decl. ¶ 12. Palladiom Shading System products have enjoyed steadily rising sales growth since 2017. Meyer Decl. ¶ 18 & n.37. Notably, this growth has occurred despite numerous competitors marketing roller window shade products with exposed brackets that look significantly more similar to Lutron's Palladiom brackets than GeigTech's brackets do. Block Decl. ¶ 15 & Ex. 3 (listing and displaying examples of such

brackets offered in the United States from at least 13 competitors). The advantages of Lutron shading systems have allowed Lutron to remain, both pre- and post-Palladiom, the top choice for home automation installers. *See* Meyer Decl. ¶ 13 (citing industry reports published by CE Pro). Excerpts from industry reports from 2016, 2017, and 2018 follow:



Results of CE PRO Studies in 2016, 2017, and 2018, Respectively. *Id.* Ex. 1.

### B.    GeigTech Re-Invented the Alleged "Invention" During Prosecution.

It is no coincidence that the invention GeigTech now claims stems from its ***post***-Palladiom patent application. The following chronology demonstrates how GeigTech's claimed "invention" mutated—including a new title, new claims, new written description, and a new drawing—after it gained access to Lutron's design in 2017. In its latest patent-in-suit, GeigTech claims priority back to a May 15, 2012 provisional application, where the chronology begins:

*1.   2012: James Geiger claims an "invention."*

May 15, 2012—James Geiger files his provisional patent application entitled "Assembly for Mounting Shades" and explains the "present embodiments provide for a system of fastening devices, e.g., mounts, brackets, and assemblies for installing roller window shades." Farbanish Decl. Ex. 1 at 10–11. He recites four basic embodiments in total:

(1) "one-piece, disk-shaped mounting brackets" with a visible "outer circumference" and "largely hidden" "mounting means" (hereinafter, "Disk Bracket");

(2) "a two-piece 'invisible mount' fastening device comprising a mounting plate and a bracket," in which "the bracket surrounds the mounting plate, obscuring it from view" (hereinafter, "Plate+Bracket Fastening Device");

(3) a system comprising a combination of Disk Brackets and a Plate+Bracket Fastening Device; and

(4) a system comprising multiple Plate+Bracket Fastening Devices.

6

*Id.* Nowhere does the provisional patent application claim that Geiger invented a one-piece bracket (other than the Disk Bracket, not at issue in this case). Nowhere does the provisional patent application claim that GeigTech invented any bracket with the classic L-shape (which does not need or use a mounting plate surrounded by a bracket). *See generally* Farbanish Decl. Ex. 1.

May 15, 2013—Geiger files his PCT patent application that ultimately results in the '821 patent, claiming priority to the provisional application. Again, his proposed independent claims recite four basic embodiments, each claiming a Plate+Bracket Fastening Device, a Disk Bracket, or some combination of these. Farbanish Decl. Ex. 2 at 13–16 (proposed claims 1, 7, 12, and 22). This application adds several new figures, including figure 21, which purports to show some kind of opening for wiring to support the Plate+Bracket Fastening Device as set forth in claim 22. *Id.* at 33. Again, nowhere does the application claim that Geiger invented a one-piece, L-shaped bracket with no surrounded mounting plate—with or without an opening for wiring.

January 15, 2016—Geiger files a purported continuation-in-part of his previous application for the '821 patent. His proposed independent claims recite three basic embodiments, each using a Plate+Bracket Fastening Device or a Disk Bracket, and nothing else. Farbanish Decl. Ex. 3 at 19–22 (proposed claims 1, 13, and 17). This application adds figures 22 and 23, which show two different views of another example of a Plate+Bracket Fastening Device. *Id*. at 9, 40. Again, nowhere does the application claim that Geiger invented a one-piece, L-shaped bracket with no surrounded mounting plate.

January 19, 2016—The '821 patent issues, with claims to Disk Brackets and a Plate+Bracket Fastening Device. *Id.* Ex. 4. As Lutron or anyone else could see, the '821 Patent discloses and claims a fastening device comprising a bracket [1, 2100] that is adapted to surround and "obscure" its mounting hardware (mounting plate [2], etc.) from view when deployed, as illustrated in the figures below, patent figures 1 and 21. *See* Maslen Decl. at 15–16. Dependent claim 8 of the '821 patent further recites an "opening for wiring" [2110 ("opening"), 2120 ("wiring")], as illustrated below in the figure on the right:



The '821 patent does not disclose end brackets that do not use, much less surround, any mounting plate; and nowhere states or suggests that the claimed invention includes L-shaped support brackets with a support foot that protrudes. *Id.* To the contrary, the specification of the '821 patent states in part: "Current brackets and mounts for roller window shades and shade systems are typically bulky, visible, and may detract from the aesthetics of the shade system." '821 patent at 1:20–22; Maslen Decl. at 19. The '821 patent effectively teaches away from L-shaped support brackets, such as those included in the Palladiom Shading System, which are structurally, mechanically, visually, and substantially different from any "bracket" that the '821 patent (or the '872 patent) identifies as suitable for use in the claimed invention. Maslen Decl. at 15–19.

September 2017—Lutron announces and shows the new Palladiom Shading System at the popular CEDIA Expo show. Case 1, Dkt. 43 (Blair Decl.) ¶ 6. Geiger learns about it and sees its design, including a one-piece, L-shaped bracket with no mounting plate. *Cf.* Case 1, Dkt. 57 at 3 (Court's order denying GeigTech's preliminary injunction and recounting evidence of James Geiger's personal access in 2017 to the brackets of Lutron's Palladiom Shading System).

### 2. *After Witnessing Palladiom, Geiger Claims a New "Invention"*

May 31, 2018—Unbeknown to Lutron, Geiger files the application that leads to U.S. Patent No. 10,294,717 (the "'717 patent").[4] This time, ***after*** he has studied the new design of Lutron's Palladiom brackets, Geiger changes the title of his patent application from "Assembly for

---

[4] The '717 patent application did not publish until September 27, 2018.

Mounting Shades" to "Shade Bracket with Concealed Wiring" (i.e., no more "assembly"; now just a "bracket"). Farbanish Decl. Ex. 5 at 1. He proposes three independent claims:

(1) a "bracket" with a "passage" for wiring (claim 1);
(2) another "bracket" with an "opening" for wiring (claim 9); and
(3) a system of two "mounting brackets," where at least one of them has an "opening" for wiring (claim 17).

*Id.* at 15–18. Thus, *for the first time*, Geiger claims "brackets," with no explicit link to his purported invention of a Plate+Bracket Fastening Device. He even changes the Abstract so that, instead of addressing "fastening devices" that include "mounts" and "brackets" as the '821 patent reflects, the Abstract now uses functional language to refer to a bracket that is "configured to be coupled" to a support surface and "configured to support" a roller window shade. There is no mention at all of a "mount" or "mounting plate." *Id.* at 19. This functional "configured to" language is not found in the '821 patent or its application. Farbanish Decl. ¶ 6.

June 12, 2018—Less than two weeks later, GeigTech sues Lutron, accusing Palladiom *jamb* brackets of infringing only the '821 patent claims reciting a type of Disk Bracket. GeigTech does not assert the '821 patent's claims to a Plate+Bracket Fastening Device—including dependent claim 8's Plate+Bracket Fastening Device with "an opening for wiring," as reflected in Figure 21—and does ***not*** accuse Lutron's one-piece, L-shaped brackets with no mounting plates (i.e., Palladiom end and center brackets) of patent infringement.

This Court denies GeigTech's motion for preliminary injunction on September 5, 2018, concluding Lutron "has raised substantial unrebutted questions about both the validity and enforceability of Plaintiff's patent and whether Lutron's product infringes the claims asserted in that patent." Case 1, Dkt. 57 at 1–2. GeigTech dismisses its patent infringement count one month later, on October 5, 2018.

November 30, 2018—The PTO rejects all claims in the '717 patent application because, among other reasons, the statutorily required "written description of the invention" (35 U.S.C. § 112) does not support the proposed claims. Farbanish Decl. Ex. 5 at 40.

December 27, 2018—In response, Geiger (a) amends the written specification to add the *54 lines of text* that will later appear at 1:37–2:23 of the '717 patent—for the first time mentioning wiring and a "passage" for wiring, in the "Summary" of the alleged invention, and using broad, functional language to reference "a bracket that can be *configured to be coupled* to a support surface and *configured to support* a roller window shade" (emphasis added); (b) submits a "replacement" for figure 21 to address a deficiency in the only patent figure that purports to show any opening for wiring; and (c) amends most of the proposed claims to overcome a 1963 patent that the Examiner said disclosed a shade bracket with a passage for wiring. *Id.* at 46–63.

April 5, 2019—Unbeknown to Lutron, eighteen (18) months after Palladiom's launch, Geiger files the application that ultimately leads to the '872 patent at issue here.[5] All proposed independent claims are directed to a bracket with an opening or passage for wiring. None of them is explicitly linked to Geiger's purported invention of a Plate+Bracket Fastening Device. Farbanish Decl. Ex. 6 at 21–24. Indeed, for the first time, Geiger proposes in claim 1 the mysteriously functional language of a bracket "configured to be *carried* by a support surface" (emphasis added). The word "carried" is nowhere to be found in the specification or in the original '821 patent. Farbanish Decl. ¶ 9. Claim 1 makes no express statement of the support surface coupling to the bracket by virtue of a surrounded mounting plate.

May 21, 2019—The '717 patent issues. All eighteen (18) claims are directed to brackets with a passage/opening for wiring. None of the independent claims explicitly recites a Plate+Bracket Fastening Device. Indeed, none of the claims even mentions a mounting plate. *See* Farbanish Decl. Ex. 7. The same day, GeigTech sues Lutron for patent infringement again, this time asserting the '717 patent. But GeigTech does not pursue any preliminary injunction or allege any ongoing irreparable harm. Case 2, Dkt. 5.

June 29, 2020—Faced with a rejection of the '872 patent claims based on the "Mitsuhiro" prior art that discloses a shade bracket with a passage for wiring (Farbanish Decl. Ex. 6 at 45–47),

---

[5] The '872 patent application did not publish until August 1, 2019.

Geiger amends all independent claims of the '872 patent to require a visible, rounded surface opposite the side of the bracket that engages the support surface (which was not his design idea, as outlined in the next section, *infra*). Geiger argues the claims should now be allowed. *Id.* at 49–54.

August 26, 2020—GeigTech files with this Court a stipulation to consolidate Cases 1 and 2 and have the consolidated case stayed pending the PGR of certain claims of the '717 patent until the summer of 2021. GeigTech explains that upcoming discovery would otherwise need to be duplicated and would "place a tremendous extra burden of cost and time on the parties." GeigTech makes no mention of alleged ongoing irreparable harm. Case 1, Dkt. 126; Case 2, Dkt. 36 at 3.

November 3, 2020—The '872 patent issues with Geiger's amended claims. Claim 1 recites a bracket "configured to be carried" by a support surface. Using functional language, none of the claims explicitly recites a Plate+Bracket Fastening Device or even mentions expressly the requirement for a surrounded mounting plate. *See* Farbanish Decl. ¶ 9.

December 3, 2020—GeigTech files this case, accusing Lutron's one-piece, classic L-shaped brackets—with a visible, protruding foot, and no surrounded mounting plate—of infringement. This time, in Case 3, GeigTech decides to claim irreparable harm and seek the same extraordinary relief this Court denied in Case 1 in 2018. Dkts. 1, 20, 21. Lutron answers on January 15, 2021, denying infringement, raising twelve (12) affirmative defenses, and asserting four (4) counterclaims for declaratory judgment of non-infringement, non-liability for alleged infringement, invalidity, and unenforceability of the '872 patent and all of its claims. Dkt. 25.

**C.    Geiger's Patent Application Was Grounded in Fraud from the Beginning.**

When this Court considered GeigTech's motion for a preliminary injunction in 2018, compelling evidence quickly emerged that GeigTech had not been upfront with the PTO about the role of Somfy shade motors and brackets in James Geiger's purported invention. *See* Case 1, Dkt. 57 at 9 ("Lutron's preliminary showing on this point is sufficiently persuasive that I must conclude that it has raised a substantial questions on both validity and enforceability."). Turns out, this was not the half of it.

In its Complaint in Case 2, GeigTech stated: "Around 2011, while working on a multi-million-dollar home, Mr. Geiger devised a new solution for the above described traditional methods of concealing screws, wires, and other hardware. . . . Mr. Geiger's concept involved exposed window roller shades ('roller shades') without any visible screws, wires, or other unsightly hardware. This concept would ultimately become the 'J Geiger Shading System.'" Case 2, Dkt. 1 at 5; *see also* Dkt. 21 at 2 ("Mr. Geiger came up with a new concept . . . .").

Lutron's investigation has uncovered that the "multi-million dollar home" was the Charbon residence—a spectacular, beachfront property on Hilton Head Island, South Carolina. And the so-called "Mr. Geiger's concept" was actually the concept of Charbon architect Matthew Taylor, as reflected in contemporaneous documents and confirmed by the August 9, 2020 Declaration of C. Matthew Taylor. As reflected in the account below, Geiger collaborated with Taylor, using Taylor's concept, and then *used drawings of the Charbon brackets from 2010 as figures in his (Geiger's) patent application two years later*. Until last year, however, Taylor was not even aware that Geiger had filed for patents based on the concept.

### 3.  *2010–2011: The Charbon project and its shading system*

The Charbon project was a "very large construction project at the Charbon residence, located on Hilton Head Island in South Carolina, during 2009 through 2012." Taylor Decl. ¶ 2. The project was "exceptionally high-end" and "required a lot of customization in almost all areas." *Id.* ¶ 4. James Geiger, through HeAVi, was a subcontractor who worked with Matthew Taylor, the project's architect, on various aspects. *Id.* ¶ 3. HeAVi was at first working primarily on "audio/video and whole-home-automation facets of the Charbon project" but in 2010 also became involved in the roller-shade project. In mid-2010, the team tasked Geiger with making custom-milled shade brackets. *Id.* ¶ 11.

> a) *Use of an exposed shade bracket was not James Geiger's idea, but the idea and design requirement of Charbon architect Matthew Taylor.*

Concerning the concept of using "exposed window roller shades ('roller shades') without any visible screws, wires, or other unsightly hardware" (as GeigTech's Complaint frames it), Matthew Taylor explains:

> 6.     The shade requirements, which I created, were that the roller shades, including their mounting brackets, would be exposed—with no valances to cover them. The brackets therefore needed to be clean in design to complement the existing details I had designed for the project, not just stamped sheet metal. In addition, the brackets, like all other facets of this job, would need to use blind fasteners and conceal electrical supply (electrical wiring). These requirements were not the idea of James Geiger or anyone with HeAVi. . . .
>
> 7.     As I mentioned, the brackets would be required to be "blind fastened" to the window jambs. This means the fastening mechanism would need to be hidden from view. This is a requirement I had throughout every fabricated component of the Charbon project—not just with the shade brackets. I wanted a clean appearance without any visible fasteners.

*Id*. ¶¶ 6–7. Contemporaneous documents confirm this account. *See* Case 1, Dkt. 119 at 13. Thus, the idea to use on the Charbon project a clean, attractive, exposed shade bracket that hid screws and obscured wiring came from the project's architect, Matthew Taylor—not subcontractor James Geiger.[6]

> b) *James Geiger collaborated with Matt Taylor to develop the Charbon designs for exposed brackets in 2010.*

After explaining in his declaration the need on the project for components with excellent aesthetics, Matt Taylor identifies the reasoning behind his idea for a circular, aluminum jamb bracket, with the "perimeter surface of the disk-shaped bracket . . . visible as an expressed structural detail, consistent with other elements [Taylor] designed in the house." Taylor Decl. ¶¶ 9–10. Taylor and Geiger worked together on the bracket design. Taylor recounts that in mid-2010, "during an in-person meeting in my office, I sketched for James on a piece of scratch paper my idea about what the brackets should look like." *Id.* ¶ 13 (describing the disk-shaped bracket design). In a later meeting with Matt Taylor, James Geiger told Taylor that "we would need to use two shades

---

[6] James Geiger has testified that "[o]bscuring the fasteners was one of the key features of my patented invention" and that "[t]he focus of the invention was to create a new exposed window shade system that hid the screws and wires." Case 1, Dkt. 48-1 ¶¶ 14, 20. But the evidence that has been uncovered confirms these were not Geiger's ideas at all, even for that project.

on the wide windows and that we would need some form of mid-span support to couple the two shades." In response, Taylor sketched out his idea for a center bracket that would be T-shaped, "where the top of the 'T' would be effectively a plate secured to the underside of the window jamb head, and with a rounded shape on the side opposite the plate, such that the bracket would form a clean looking U shape from a side view and would hold one end of each shade." His goal was to achieve "an attractive, minimalist look." Geiger, though, instead chose a "slide connector" (i.e., a mounting plate), which Taylor confirms "was not my idea." *Id.* ¶¶ 16–17.

On December 15, 2010, James Geiger emailed to Matt Taylor drawings of "the latest set of brackets he was having custom milled." The drawings were entitled "Window Casing Shade Mounts" and are attached to the Taylor Declaration. Taylor confirms they show "drawings of three brackets designed based on my ideas discussed above, including jamb brackets and the coupler bracket discussed above, using James's idea for the slide connector." *Id.* ¶ 18. In a subsequent December 2010 email, Taylor noted that "it was my idea and my sketch that started the process" and that Geiger was "developing the idea." *Id.* ¶ 19.

> c) *James Geiger sold the exposed brackets to the Charbon project by January 2011, well over a year before filing the provisional patent application.*

James Geiger filed the provisional patent application that led to the previously asserted '821 patent on May 15, 2012. But James Geiger and HeAVi offered the exposed brackets for sale to the Charbon project in 2010 and even issued their invoice for the brackets in January 2011, well over a year *before* Geiger's earliest provisional patent application filing. *See* Case 1, Dkt. 119 at 15–16. These exposed Charbon brackets of 2010 would later become Geiger's claimed invention of 2012. *See* Case 1, Dkt. 119 at 18–20 (highlighting three examples to confirm). For example, the '821 patent identifies its figure 5 as "an alternative embodiment of the invention, in which the mounting plate slides into and is hidden within the bracket." '821 patent at 2:14–16. This figure 5 of the patent matches the "Coupler" (i.e., a Plate+Bracket Fastening Device) in the Charbon drawings that Geiger sent to Taylor on December 15, 2010, as seen here:

| Figure 5, '821 Patent | Charbon Drawings of Dec. 15, 2010 |
|---|---|
|  | |

4. *For all nine years of patent prosecution, James Geiger deceptively concealed the role of his idea man and collaborator, Matt Taylor.*

For the entire period of his patent prosecution from 2012 to the present, James Geiger has held himself out as a sole inventor, never disclosing architect Matthew Taylor's contribution to, or their collaboration on, the design of the brackets. Taylor was not even aware of the prosecution or the patents until last year. *See* Taylor Decl. ¶ 23. Notably, in order to overcome the PTO's rejection and to obtain the '872 patent-in-suit, Geiger had to amend his proposed claims on June 29, 2020, in order to distinguish his claims from the prior art raised by the Examiner, and he did so by adding one final claim limitation: "wherein a surface of the bracket substantially opposite the side has a rounded shape and is visible when the bracket is carrying the roller window shade assembly." Farbanish Decl. Ex. 6 at 50–54. This claim limitation, manifestly critical to issuance, was the contribution of Taylor, not Geiger. *See* Taylor Decl. ¶¶ 6, 16.

## III.   ARGUMENT

"It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2498 (2d ed. 1995)).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v.*

*Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* at 24 (internal quotation omitted).

In this case, each of the factors informing the Court's exercise of equitable discretion supports denial of GeigTech's motion. GeigTech has failed to make any clear showing that it is likely to succeed on the merits (Part III.A, *infra*); GeigTech has failed to demonstrate that it lacks adequate legal remedies (Part III.B, *infra*); the balance of hardships overwhelmingly favors denial of GeigTech's motion (Part III.C, *infra*); and the public interest also strongly favors denial of GeigTech's motion (Part III.D, *infra*).

## A.  GeigTech Has Failed to Establish That It Is Likely to Succeed on the Merits

Lutron denies infringement (Dkt. 25 ¶ 53) and has raised twelve (12) affirmative defenses to GeigTech's claim. *Id*. at 8–13. GeigTech's motion devotes but a single paragraph to the issue of patent "validity" (Dkt. 21 at 14) and does not address the substance of Lutron's invalidity defenses even though a number of them were previously presented in Case 1. GeigTech's motion completely fails to address applicable "principles of equity" (35 U.S.C. § 283); and its theory of alleged infringement amounts to "a mere trick of words and vague generalities" not establishing infringement in fact. *Carlton v. Bokee*, 84 U.S. (17 Wall.) 463, 468 (1872).

### 1.    GeigTech's Claim Is Barred by Intervening Adverse Rights.

At issue in this case are certain L-shaped support brackets ("Palladiom Brackets") that Lutron started marketing and selling in **2017**. The now accused Palladiom Brackets clearly do not embody the Plate+Bracket Fastening Device "invention" (see illustration p. 8 *supra*) that the original '821 Patent disclosed and claimed. *See* Maslen Decl. at 15–16. In its original failed suit for alleged infringement of the '821 Patent, GeigTech did not even allege that Palladiom Brackets (whose design is exactly the same now as it was in 2018) practiced the '821 Patent.

It was not until April 5, 2019, more than three years following issuance of the '821 Patent, that GeigTech filed the application (the "'814 Application") that resulted in issuance of the now asserted '872 patent. In the more than three years between the issuance of the '821 Patent and

16

the filing of the '814 Application, Lutron lawfully developed, launched, and built up a multi-million dollar Palladiom Shading System business now attacked by GeigTech. GeigTech's motion admits (Dkt. 23 ¶ 13) to awareness of Lutron's marketing of Palladiom Shading System products as early as September 2017.

In these circumstances, GeigTech's claim in this case is clearly barred by "intervening adverse rights." *Cancer Research Tech. Ltd. v. Barr Labs.*, 625 F.3d 724, 730 (Fed. Cir. 2010) (quoting *Gen. Talking Pictures Corp. v. W. Elec. Co.*, 304 U.S. 175, 183 (1938)). Where, as here, a patentee delays for more than two years[7] in filing an application seeking claims to subject matter disclosed, but not claimed as an invention, in an already-issued patent; and when, during the period of delay, a third-party has developed and sold products that fall outside the scope of the original patent, the later-filed application and any resulting patent are subject to intervening adverse rights. *See, e.g.*, *Webster Elec. Co. v. Splitdorf Elec. Co.*, 264 U.S. 463, 466–71 (1924); *Ives v. Sargent*, 119 U.S. 652, 662 (1887); *Cancer Research*, 625 F.3d at 730–31; *Symbol Techs., Inc. v. Lemelson Med. Educ. & Research Found. LP.*, 422 F.3d 1378, 1386 (Fed. Cir. 2005); *Otis Elevator Co. v. Atl. Elevator Co.*, 47 F.2d 545, 548–60 (2d Cir. 1934) (L. Hand, J.); *Stanley Works v. C. S. Mersick Co.*, 34 F. Supp. 914, 919–20 (D. Conn. 1940); *Ashley v. Samuel C. Tatum Co.*, 240 F. 979, 982–83 (S.D.N.Y. 1917) (A. Hand, J.). This principle is fatal to GeigTech's motion.

GeigTech's motion for preliminary injunction does not address the subject of intervening adverse rights; however, in a separate motion filed February 5, 2021 (Dkt. 32), GeigTech has asserted: "The defense of intervening rights does not and cannot apply in this case because the '872 patent is a continuation of the '717 patent and has not been modified in any way since its issuance on November 3, 2020." *Id.* at 14. GeigTech is wrong. A patent issuing on a "continuation" application is subject to "intervening adverse rights," *Gen. Talking Pictures*, 304 U.S. at

---

[7] The period of delay giving rise to intervening rights historically has been measured by the length of the "public use" bar, which was two (2) years between 1839 and 1939. The "public use" bar is currently only one (1) year, *see* 35 U.S.C. § 102. Intervening adverse rights may thus ripen, today, one year following issuance of a patent, although the delay here was more than two years.

183, *quoted in Cancer Research*, 625 F.3d at 730, just as are patents issuing on any other type of application that claims the benefit of an earlier filing date. *See Crown Cork & Seal Co. v. Ferdinand Gutmann Co.*, 304 U.S. 159, 167–68 (1938); *Symbol Techs.*, 422 F.3d at 1386.

GeigTech cites *Marine Polymer Technologies, Inc. v. Hemcon, Inc.*, 672 F.3d 1305 (Fed. Cir. 2012), as purportedly exempting the '872 patent from intervening rights (*see* Dkt. 32 at 14); but *Marine Polymer* supports no such exemption. *Marine Polymer* held that a claim in an original patent, which survived a request for reexamination without change, was not an "amended or new claim" within the meaning of 35 U.S.C. § 307(b). *See* 672 F.3d at 1365. *Marine Polymer* did not deal with either a patent or a factual situation analogous to what is presented in this case.

GeigTech's claim is barred by intervening adverse rights because (i) the application that resulted in the '872 patent was not filed until more than three years following issuance of the '821 Patent; and (ii) during that period of more than three years, Lutron lawfully developed and sold the now-accused Palladiom Brackets, which fall outside the scope of the original '821 Patent. *See Cancer Research*, 625 F.3d at 730 ("*In the absence of intervening adverse rights* for more than two years prior to the [filing of new claims in] continuation applications, they were [filed] in time") (emphasis added) (quoting *Gen. Talking Pictures*, 304 U.S. at 183). In the parlance of *Marine Polymer*, the claims in the '872 patent are completely "new" relative to those that existed when the Palladiom Shading System line was developed and launched.

The doctrine of intervening adverse rights exists precisely to prevent the type of abuse of the patent system that GeigTech is attempting to accomplish here. The now-accused Palladiom Brackets very clearly did not and do not embody what GeigTech originally told the world, in its '821 Patent, was Mr. Geiger's alleged "invention." *See* Maslen Decl. at 15–16. It was only after seeing Lutron's Palladiom Shading System products in 2017 (Dkt. 23 ¶ 13) that GeigTech, more than three years following issuance of the '821 Patent, attempted to *re-patent* Mr. Geiger's already-patented invention under the color of (i) new text inserted into the patent specification; (ii) an altered drawing; and (iii) new claim words that GeigTech, in this case, asserts are so broad as

to encompass subject matter nowhere disclosed in the '872 patent, a "transformation by a mere trick of words and vague generalities." *Carlton*, 84 U.S. (17 Wall.) at 468; *see* pp. 9–10 *supra*.

Public use of an alleged invention bars patentability after a specified period of time, *see* 35 U.S.C. § 102; and such use can similarly give rise to intervening adverse rights following issuance of a patent. In *Mahn v. Harwood*, 112 U.S. 354, 360–61 (1884) (emphasis added), the Court explained:

> The taking out of a patent which has (as the law requires it to have) a specific claim, is notice to all the world, of the most public and solemn kind, that all those parts of the art, machine or manufacture set out and described in the specification and not embraced in such specific claim, are not claimed by the patentee. . . . *The public is notified and informed by the most solemn act on the part of the patentee, that his claim to invention is for such and such an element or combination, and for nothing more. Of course, what is not claimed is public property.* The presumption is, and such is generally the fact, that what is not claimed was not invented by the patentee, but was known and used before he made his invention. But, whether so or not, his own act has made it public property if it was not so before. The patent itself, as soon as it is issued, is the evidence of this. *The public has the undoubted right to use, and it is to be presumed does use, what is not specifically claimed in the patent. Every day that passes after the issue of the patent adds to the strength of this right* . . . .

The '814 Application was filed more than three years following issuance of the '821 Patent and after Lutron had developed and started selling Palladiom Brackets outside the scope of the '821 Patent. In these circumstances GeigTech bears the burden of pleading and proving "special circumstances justifying" its more than 3-year delay in filing the '814 Application. *Webster Elec.*, 264 U.S. at 471; *see Wollensack v. Reiher*, 115 U.S. 96, 100–01 (1885). GeigTech's failure to do this is, without more, fatal to GeigTech's motion for preliminary injunction.

### 2.    The Asserted '872 Patent Claims Are Anticipated and Invalid.

GeigTech has failed to establish likelihood of success on the merits for the separate and independent reason that, under the theory of infringement that is asserted in GeigTech's motion, asserted claims 1–4 of the '872 patent are fully anticipated by expired U.S. Patent No. 1,476,160 to Kirsch ("Kirsch") as shown in the claim chart attached as Exhibit 1 hereto. Maslen Decl. at 14 & Ex. 1; Kruger Decl. ¶ 8.

Lutron is separately submitting a computer animation showing how the claims of the '872 patent, if given the sweeping reach that GeigTech has asserted they have in this case, are fully anticipated by a single prior art reference, Kirsch, which discloses a roller shade bracket fixture dating to the 1920's having decorative, exposed rounded covers and a "passage" that happens to be configured to receive and obscure an electrical wire. The accompanying Maslen and Kruger declarations also identify a computer animation showing this fact, and also show how the Kirsch brackets are configured to support an off-the shelf, electrically powered tubular motor.

GeigTech's motion devotes just one conclusory paragraph (Dkt. 21 at 14) to the issue of patent validity even though GeigTech has long known of derivation and other of Lutron's invalidity defenses. GeigTech falsely states (*id.*) that the PTO has purportedly already "considered" the invalidity evidence and contentions presented with this opposition. In fact, the '872 patent issued without the benefit of Kirsch or the expert evidence submitted herewith. GeigTech has not shown that any of Lutron's invalidity defenses "lack[] substantial merit." *Altana Pharma AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999, 1006 (Fed. Cir. 2009).

The asserted claims do not require the actual presence of an electrical wire (Maslen Decl. at 14) and so are fully anticipated by Kirsch; however, insofar as GeigTech might now argue that the asserted claims require the presence of an electrical wire, the accompanying Maslen declaration and computer animation show that the asserted claims clearly fail the non-obvious subject matter condition (35 U.S.C. § 103) as involving (1) "the predictable use of prior art elements according to their established functions," *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007), (2) "the simple substitution of one known element [an electric tubular motor] for another [a spring motor]," *id.*, and (3) "the mere application of a known technique [electrifying] to a piece of prior art [Kirsch] ready for the improvement." *Id.*; *see* Maslen Decl. at 14–15.

### 3.   The '872 Patent Is Invalid for Failure to Name All Inventors.

Lutron has presented substantial evidence, including contemporaneous documentary evidence, that third party Matthew Taylor is, at the very least, a co-inventor of the bracket subject matter claimed in the '872 patent. Deliberate failure to name a co-inventor can constitute grounds

for holding a patent invalid or unenforceable. *See Egenera, Inc. v. Cisco Sys., Inc.*, 972 F.3d 1367, 1376 (Fed. Cir. 2020).

The accompanying declaration of Matthew Taylor supports a finding that GeigTech's failure to name Mr. Taylor as a co-inventor in the '872 patent was not a correctable "error," *id.*, but was a knowing and deliberate act designed to cut Mr. Taylor out of any patent rights that might result from the filing of the '814 Application. Dkt. 25 at 10. Here again, GeigTech has made no showing that this defense "lacks substantial merit." *Altana*, 566 F.3d at 1006. This is, thus, an independent basis for denial of GeigTech's motion.

### 4.    GeigTech Has Failed to Show Infringement.

GeigTech's discussion of infringement consists of a single paragraph (Dkt. 21 at 14) that asserts, on the basis of lay opinion testimony from Mr. Geiger, that the words in claims 1–4 of the '872 patent purportedly describe the now accused Palladiom Brackets. (As shown in Exhibit 1 hereto and in the accompanying computer animations, GeigTech's current infringement theory, if accepted, would also render the asserted claims invalid.) Even assuming, for purposes of argument, that Mr. Geiger were competent to render an opinion with regard to the issue of infringement in this case (Mr. Geiger claims to have a degree in "business administration"; *see* Dkt. 22 ¶ 4), his simplistic presentation is wholly inadequate to establish infringement:

> If the claims read literally on the accused structures, an initial hurdle in the test for infringement has been cleared. The race is not over; it has only started. To allow literality to satisfy the test for infringement would force the patent law to reward literary skill and not mechanical creativity.

*Autogiro Co. of Am. v. United States*, 384 F.2d 391, 399 (Ct. Cl. 1967), *adopted as binding precedent in South Corp. v. United States*, 690 F.2d 1368, 1369 (Fed. Cir. 1982) (en banc). "This approach of making literal overlap only a step and not the entire test of infringement has been consistently applied by the courts since *Westinghouse v. Boyden Power Brake Co.*, 170 U.S. 537, at 568, 18 S.Ct. 707, at 722, 42 L.Ed. 1136 (1898)." *Autogiro*, 384 F.2d at 400.

To show infringement, a patentee must show an accused product "contain[s] elements identical or equivalent to each claimed element of the patented invention." *Warner-Jenkinson Co. v.*

*Hilton-Davis Chem. Co.*, 520 U.S. 17, 40 (1997). "[I]n determining the question of infringement, *the court or jury*, as the case may be, *are not to judge about similarities or differences by the names of things*, but are to look at the machines or their several devices or elements in the light of what they do, or what office or function they perform, and how they perform it." *Mach. Co. v. Murphy*, 97 U.S. 120, 124 (1877) (emphasis added). "[D]evices in a patented machine are different in the sense of the patent law when they perform different functions or in a different way, or produce a substantially different result." *Id.*; *see Warner-Jenkinson*, 520 U.S. at 26 ("In the context of infringement, we have already held that pre-1952 precedent survived the passage of the 1952 Act"); *id.* at 35 (quoting *Mach. Co.*, 97 U.S. at 125).

Asserted claims 1–4 of the '872 patent each require a bracket "configured to be carried by a support surface." The only fastening devices that are disclosed in the '872 patent and meet the description of asserted claims 1–4 are fastening devices in which, as in figures 1 and 21 of the '872 patent, a T-shaped mounting plate (2) is adapted to be attached to a support surface and to carry a complementary bracket (2100) whose configuration is adapted to fit over, surround, and hide the mounting plate (2) when the bracket is installed. Maslen Decl. at 13. The now accused Palladiom Brackets are mechanically, structurally, visually, and substantially different from any corresponding "bracket" that is disclosed in the '872 patent and that could, thus, be referred to by the asserted claims. Maslen Decl. at 16–19. *See, e.g.*, *Mackay Radio & Tel. Co. v. Radio Corp. of Am.*, 306 U.S. 86, 101 (1939) (no infringement even though claim words encompassed configuration of accused radio antennas); *Weber Elec. Co. v. E.H. Freeman Elec. Co.*, 256 U.S. 668, 675 (1921) (no infringement even though claim words encompassed configuration of accused lamp socket); *Westinghouse*, 170 U.S. at 568–71 (no infringement even though claim words encompassed configuration of train air brake valve); *Nat'l Water Meter Co. v. Yonkers Water Comm'rs*, 149 U.S. 48, 55 (1893) (no infringement even though claim words described configuration of piston in accused water meter).

**B.  GeigTech Has an Adequate Monetary Remedy.**

By GeigTech's own admission (Dkt. 23 ¶ 13), the now accused Lutron Brackets have been on sale in the United States since 2017. GeigTech's litigation conduct has been fundamentally inconsistent with its suggestion, now, that the damage remedy prescribed in 35 U.S.C. § 284 is somehow "inadequate" to redress any infringement GeigTech might ultimately succeed in proving. *See Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 509 (1959) ("equity has always acted only when legal remedies were inadequate").

When the Court denied GeigTech's first motion for preliminary injunction in Case 1, GeigTech did not then seek an early trial but abruptly abandoned its claim for alleged patent infringement. In Case 2, GeigTech did not seek any preliminary injunctive relief or a prompt early trial, and also stipulated to a stay pending resolution of post-grant review proceedings in the PTO. These past actions by GeigTech speak volumes: GeigTech's sole alleged injury is entirely economic in nature and fully redressable by way of money damages.

35 U.S.C. § 284 is very generous to patentees in authorizing awards of money damages even where a plaintiff patentee cannot show any actual sales diversion, lost sales revenue, or lost profits on sales. If GeigTech were to succeed on its hotly disputed infringement claim, GeigTech would be entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use of the invention made by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. Expert testimony is routinely used to establish such damages. *See* Meyer Decl. ¶ 22.

GeigTech's claimed right to be free of competition with Palladiom Shading System (Dkt. 23 ¶¶ 15–20) begs the very issue to be decided in this case. Many companies offer motorized roller window shades having exposed decorative brackets. Block Decl. ¶ 15 & Ex. 3; Meyer Decl. ¶ 15; Smith Decl. ¶¶ 5, 11. They, not GeigTech, would primarily benefit from destruction of Lutron's Palladiom Shading System business. Block Decl. ¶ 16.

GeigTech's claim that Lutron's continued offering of Palladiom Shading System products will cost it business (Dkt. 23 ¶¶ 21–34, 45) is unsupported. Meyer Decl. ¶¶ 5–8. Substantial

evidence supports a finding that the preliminary injunction sought by GeigTech would not, in fact, benefit GeigTech to any significant degree due in part to shortcomings in GeigTech's own products and lack of dealer and marketing support. *Id.* ¶¶ 12–14; Block Decl. ¶ 16.

GeigTech's claim that Lutron's continued offering of Palladiom Shading System products would harm its reputation (Dkt. 23 ¶¶ 35–41) is also unsupported. *See* Block Decl. ¶¶ 9–13, 16; Smith Decl. ¶ 6. GeigTech goes so far as to assert that Palladiom Shading System product awards (Dkt. 23 ¶¶ 42–43) were won at GeigTech's expense. In fact, Palladiom Shading System products embody market-leading drive mechanisms, reduced light gaps, and precision operation that GeigTech simply cannot match. Block Decl. ¶¶ 10–13; Smith Decl. ¶ 6.

GeigTech's claim of "price erosion" (Dkt. 23 ¶ 44) is unsupported. Palladiom Shading System products are priced *higher* than, and at a *premium* to, GeigTech products that GeigTech asserts are substitutes for Lutron Palladiom Shading System products. Meyer Decl. ¶¶ 17–19; Block Decl. ¶ 5; Smith Decl. ¶ 4.

In sum, GeigTech has failed to present any competent or credible evidence that it will lack adequate legal remedies if it ultimately succeeds on the merits of its claims. This is an independent basis for denial of GeigTech's motion.

### C.   The Balance of Hardships Favors Denial of GeigTech's Motion

The preliminary injunction sought by GeigTech would bring about the immediate destruction of Lutron's long-established Palladiom Shading System business and deprive the Court of its ability to render a meaningful decision in Lutron's favor in this case, contrary to first principles of preliminary injunctions. *See Warnervision Ent'mt Inc. v. Empire of Carolina, Inc.*, 101 F.3d 259, 261 (2d Cir. 1996). "This concept—preservation of the court's power to render a meaningful decision after trial on the merits—has been, and continues to be, a basic principle of preliminary injunction law." *Id.* A preliminary injunction "ought not to be used to give final relief before trial" or "permit one party to obtain an advantage by acting, while the hands of the adverse party are tied by the writ." *Id.* at 262 (quotations omitted).

As set out in the accompanying declaration of Michael F. Smith, the requested order would cause severe and incalculable damages to Lutron's business and relations with dealers, specifiers, influencers, and others engaged in marketing, selling, and supporting Palladiom Shading System products. Smith Decl. ¶¶ 9–13. The Palladiom Shading System line is positioned at the premium end of Lutron's residential covering product range. *Id.* ¶ 4. Its unique features and benefits, including market-leading quietness, shading performance, and precision operation, are highly important to persuading dealers, architects, developers, interior designers, owners' representatives, general contractors, and others that Lutron offers the best, most technologically advanced, highest performing window shading products available in the market today. *Id.* ¶ 6.

The sudden loss of this highly acclaimed, award-winning product line following more than three years of continuous marketing, sales, promotion, and training would severely injure Lutron's business and relationships with dealers, specifiers, influencers, and others involved in the marketing, distribution, and support of the product. *Id.* ¶ 13. That kind of injury does not readily lend itself to quantification in monetary terms. *Id.*

### D.   The Public Interest Favors Denial of GeigTech's Motion.

Insofar as there may be a public interest in this purely private dispute between two sellers of window shading products, that interest favors denial of GeigTech's motion. Claims in issued patents perform a critical notice function. Competitors are entitled to rely on claims in issued patents when designing and developing new products.

The record invites, if it does not compel, the inference that GeigTech in this case has sought to game the U.S. patent system. After seeing Lutron's Palladiom Shading System products in the marketplace, GeigTech went back to the PTO, more than three years following issuance of the '821 Patent, and attempted to use vague new claim words to set up a lawsuit against Lutron.

To grant a preliminary injunction in such circumstances would be to punish Lutron for engaging in lawful new product development and to reward ex post facto gamesmanship in the PTO. The Court should act to discourage, not encourage, what GeigTech is attempting to do in this case.

Dated: February 12, 2021

/s/ James D. Herschlein
James D. Herschlein
Paul C. Llewellyn
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
T: 212.836.8000
F: 212.836.8689
james.herschlein@arnoldporter.com
paul.llewellyn@arnoldporter.com

James W. Dabney
Michael M. Polka
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004-1482
T: 212.837.6803
F: 212.299.6803
james.dabney@hugheshubbard.com
michael.polka@hugheshubbard.com

Scott W. Breedlove
Minghui Yang (pro hac vice forthcoming)
CARTER ARNETT PLLC
8150 North Central Expressway, Suite 500
Dallas, TX 75206
T: 214.550.8188
F: 214.550.8185
sbreedlove@carterarnett.com
myang@carterarnett.com

**ATTORNEYS FOR DEFENDANT
LUTRON ELECTRONICS CO., INC.**