**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
———————————————————————

GEIGTECH EAST BAY LLC,

     Plaintiff and Counterclaim-Defendant,

     -against-

                                      No. 20-cv-10195 (CM)

LUTRON ELECTRONICS CO., INC.,

     Defendant and Counterclaim-Plaintiff.

———————————————————————

**DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND STAYING THE REMAINDER OF THE CASE**

McMahon, J.

     This is the third lawsuit filed by GeigTech East Bay against Lutron Electronics alleging patent infringement because of its Palladiom Shading System – an integrated system of automated window shade rollers. In each litigation, GeigTech has alleged that various aspects of the brackets that secure the window shade system to a ceiling or wall infringes on GeigTech's patented technology.

     In the first lawsuit – which alleged infringement of U.S. Patent No. 9,237,821 – GeigTech filed a motion for preliminary injunction similar to its motion for a preliminary injunction currently pending in this case. That motion was denied, and GeigTech later voluntarily dismissed its patent infringement claim, although it continues to pursue a trade dress claim.

     GeigTech's second lawsuit alleged infringement of U.S. Patent No. 10,294,717. In that case, Lutron filed a counterclaim to have the Court declare that the patent was unenforceable. GeigTech filed a motion to dismiss the counterclaim, but before the Court could rule, the parties moved to consolidate both cases and stay them, pending a decision of the Patent Trial and Appeal

1

Board, which was reviewing a post-grant review petition Lutron had filed challenging the validity of the '717 patent. The court granted the motion; a final PTAB decision is still pending. For that reason, both pending cases are stayed.

However, in the interim, GeigTech filed this case, the third iteration of its patent-infringement lawsuit; this time alleging infringement of U.S. Patent No. 10,822,872 (which is a continuation of the two patents asserted earlier). Pending before the Court are two motions filed by GeigTech: (1) a motion for a preliminary injunction, which asks the Court to enjoin Lutron from making and selling its allegedly infringing products; and (2) a motion to dismiss Lutron's counterclaim against GeigTech, which asks the Court to declare the '872 patent unenforceable.

The motion for a preliminary injunction is denied.

As Lutron's counterclaim and GeigTech's motion to dismiss are substantially identical to motions filed in the stayed litigation over the '717 patent, judicial economy suggests that this case, too, should be stayed pending a final decision from the PTAB. As the '872 patent here in suit is a continuation of the '717 patent, whatever the PTAB decides about the earlier patent will provide valuable insight on how this litigation should proceed.

I thus *sua sponte* consolidate this case with the two already pending before the Court and subject this case to a stay.

## I.      BACKGROUND

### A.  The Parties

Plaintiff GeigTech East Bay LLC does business as J Geiger Shading Technology. It is a South Carolina limited liability company with its principal place of business in South Carolina.

GeigTech was founded by James Geiger, who is a "pioneer and entrepreneur in the field of home integration" and has over twenty years' experience in the field. (Compl. at ¶ 10). Geiger

2

installed his first set of window shades around 1999 and first conceived of the patented concept at issue in this case around 2011, when he "devised a new solution for exposed window roller shades . . . that did not require them to be hidden by the traditional methods." (Compl. at ¶¶ 14, 16). In 2012, Geiger added to his system by devising "a method to conceal electrical wiring inside a passage through the roller shade bracket." (Compl. at ¶ 18). Geiger began marketing and selling his "J Geiger Shading System" soon thereafter. (Compl. at ¶ 23).

Defendant Lutron Electronics Co., Inc. is a Pennsylvania corporation. According to GeigTech's submissions in the first lawsuit, Lutron is an "industry leader in lighting and shade control," offering more than 15,000 products worldwide with thousands of employees and hundreds of millions of dollars in annual revenue. (Case No. 18-cv-5290, Dkt. No. 15 at 6).

### B.  The Patent

GeigTech holds the rights to the patent-in-suit, U.S. Patent No. 10,822,872 ("the '872 patent"). The patent is entitled "Shade Bracket with Concealed Wiring" and was issued on November 3, 2020. It states that it is a continuation of several prior patents filed by GeigTech, including the '821 and '717 patents – the patents involved in the earlier two lawsuits.

GeigTech's complaint asserts that Lutron's Palladiom System infringes on "at least" claims 1–4 of the '872 patent. Claim 1 – the only independent claim of the four – describes, in relevant part ('872 patent, Dkt. No. 1, Ex. A at 26):

> A fastening device for supporting a roller window shade assembly comprising:
> a bracket configured to be carried by a support surface;
> a side included in the bracket configured to engage the support surface so that the bracket extends away from the support surface to carry a roller window shade assembly;
> a passage included in the bracket configured to receiving an electrical wire extending from the support surface through the bracket to a motor carried by the roller window shade assembly; and,

wherein the bracket is configured to obscure the electrical wire when the bracket is coupled to the support surface and supports the window shade assembly . . . .

### C.  The Palladiom Shading System

Lutron manufactures and sells the Palladiom Shading System, which is a mechanized window shade consisting of roller tubes with attached fabric shades, bottom rails, mounting brackets, sensors, motors, and power supplies – basically, an automated window shade. Lutron first began offering Palladiom products in 2017 and advertises the system as one that is "engineered to be beautiful" by hiding certain aspects of traditional shading systems that customers found aesthetically unpleasant. (Dkt. No. 33 at 2). One aspect of the Palladiom System touted by Lutron is its exposed, decorative brackets, which Lutron describes as a "classic L-shape . . . that protrudes and is used to secure the structure to a support surface – i.e., a wall or ceiling." (*Ibid*.). The brackets are made so that wires can be hidden and run through them without being "exposed." Palladiom System products "have won prestigious awards and are positioned at the top of Lutron's window shading product range." (*Id*. at 5).

GeigTech asserts that the brackets the Palladiom System uses to secure itself to a support surface infringe the '872 patent. GeigTech observes that the Palladiom System "includes a side in the bracket configured to engage the support surface so that the bracket extends away from the support surface to carry a roller window shade assembly." (Compl. at ¶ 42). This configuration causes the bracket to lie "substantially flat" so that it fits onto a flat support surface. (Compl. at ¶ 43). GeigTech also claims that the System includes a "passage in the bracket configured to receive an electrical wire extending from the support surface through the bracket to a motor carried by the roller window shade assembly." (Compl. at ¶ 44). The brackets are configured "to obscure the electrical wire when the bracket is coupled to the support surface and supports the roller window

shade assembly." (Compl. at ¶ 48). GeigTech claims that all of these elements are claimed by the '872 patent – in essence, that Lutron infringes on the patent by offering brackets that lie flat against a support surface and by obscuring the electrical wiring that can be run through it.

### D.  History of Litigation

The present lawsuit is the third lawsuit involving the same parties and different patents, but the same allegedly infringing product – Lutron's Palladiom Shading System.

#### 1.  First Infringement Case ("the Trade Dress Case")

GeigTech first filed suit against Lutron on June 12, 2018, alleging infringement of U.S. Patent No. 9,237,821 and trade dress infringement. The '821 patent was issued on January 16, 2016 and is entitled "Assembly for Mounting Shades." It recites claims for a "fastening device for mounting a roller window shade" to flat surfaces.[1] GeigTech alleged that the Palladiom System's jamb brackets infringed on two claims of the '821 patent, specifically that "at least one of the mounting brackets is configured as a key to engage a tube shade clutch or a tube shade motor" and that "at least one of the mounting brackets is configured to receive a tube shade pin or a motorized tube shade idler pin." ('821 patent, Claims 9, 15; Case No. 18-cv-5290, Dkt. No. 1, Ex. A at 24). The parties referred to these elements as the "key" and "pin" elements, and the sides disputed how each of these terms should be construed. In this case, GeigTech did not allege that the infringing aspect of the Palladiom System's jamb brackets was its support structure to a wall or ceiling – only the brackets' "key" and "pin" elements.

---

[1] For example, Claim 9 of the '821 patent – one of the claims that GeigTech accused Lutron of infringing – recites (Case No. 18-cv-5290, Dkt. No. 1, Ex. A at 24):

> A fastening device for mounting a roller window shade, comprising:
>
> two disk-shaped mounting brackets, each having one side configured to bear against a flat surface and one side having a projection configured to hold an end of a tube shade, wherein each of the mounting brackets have two recessed apertures therethrough constructed and arranged to receive a fastener to secure the mounting bracket to the flat surface . . . wherein the projection of at least one of the mounting brackets is configured as a key to engage a tube shade clutch or a tube shade motor.

On June 21, 2018, GeigTech filed a motion for preliminary injunction, asking the Court to enjoin Lutron from continuing to produce and sell Palladiom System products, on both patent infringement and trade dress infringement grounds.

On the patent-infringement point, the Court concluded that GeigTech failed to demonstrate that it was likely to succeed on the merits of its claim, as Lutron had raised serious questions about the validity and enforceability of the patent. Of particular relevance was Lutron's argument that GeigTech allegedly failed to disclose certain information to the Patent and Trademark Office ("PTO") during the prosecution of the '821 patent, including "that the brackets for which it obtained a patent were designed to fit into a pre-existing product – the Somfy shade motor – or that Somfy's own brackets, which were used with Somfy motors for many years, anticipate the 'key' element" integral to GeigTech's infringement claims. *GeigTech East Bay LLC v. Lutron Elecs. Co.*, No. 18-cv-5290 (CM), 2018 WL 4360792, at *5 (S.D.N.Y. Sept. 5, 2018). If Lutron's allegations about what GeigTech failed to disclose were true, that "would invalidate both claim 9 and claim 15 of the '821 patent." *Ibid*. And since the parties heavily disputed the construction of the term "key" in the patent, a decision on claim construction would very likely impact the invalidity determination. As Lutron had raised "substantial questions on both validity and enforceability" and claim construction had not yet concluded, GeigTech – as the party seeking a preliminary injunction – failed to demonstrate a likelihood of success on the merits of its infringement claim. *Ibid*. The Court also concluded that GeigTech failed to demonstrate a likelihood of success on the merits of its trade dress claim, and denied GeigTech's motion for a preliminary injunction on September 5, 2018.

GeigTech did not take an appeal from the denial of the motion for preliminary injunctive relief. Instead, on October 5, 2018, GeigTech voluntarily dismissed its claim alleging infringement

of the '821 patent. (Case No. 18-cv-5290, Dkt. No. 63). Its trade dress claim remains pending. Hereafter, the court will refer to this case as the "trade dress case."

   2. Second Infringement Case

GeigTech filed a second suit against Lutron on May 21, 2019, this time alleging infringement of U.S. Patent No. 10,294,717. The '717 patent was issued on the day that the second suit was filed (May 21, 2019) and is entitled "Shade Bracket with Concealed Wiring." The '717 patent is a continuation of the claims in the '821 patent and recites eighteen claims for "A bracket configured to be coupled to a support surface and configured to support a roller window shade assembly." (Case No. 19-cv-4693, Dkt. No. 5). GeigTech accused Lutron of infringing at least five of the patent's claims by having similar support brackets.[2] For example, one allegedly infringing aspect is that the Palladiom System "includes a side configured to bear against the support surface such that the bracket extends away from the support surface and is adjacent to an end of the roller window shade assembly." (*Id*. at ¶ 43). Another allegedly infringing aspect is "a bracket configured to obscure the electrical wiring . . . wherein the side of the bracket is at least substantially flat to facilitate the side to bear against a substantially flat support surface." (*Id*. at ¶ 49).

On August 9, 2019, Lutron filed its answer and asserted several counterclaims against GeigTech, asking the Court to declare the '717 patent invalid or unenforceable. (Case No. 19-cv-

---

[2] For example, Claim 4 of the '717 patent – one of the claims that GeigTech accused Lutron of infringing – recites, in relevant part (Case No. 19-cv-4693, Dkt. No. 5, Ex. A):

> A bracket configured to be coupled to a support surface and configured to support a roller window shade assembly, the bracket comprising:
>> a side configured to bear against the support surface such that the bracket extends away from the support surface and is adjacent an end of the roller window shade assembly;
>> a passage extending through the bracket from the side to an area of the bracket adjacent the roller window shade assembly;
>> wherein the passage is configured to receive electrical wiring therethrough such that the electrical wiring can pass from the support surface to the roller window shade assembly to power a motor of the roller window shade assembly;
>> wherein the bracket is configured to obscure the electrical wiring when the bracket is coupled to the support surface and supports the roller window shade assembly . . . .

4693, Dkt. No. 23). As it had in the first lawsuit over the '821 patent, Lutron argued that the '717 patent was unenforceable because GeigTech had allegedly failed to disclose certain material information to the PTO during the prosecution of the '821 patent (through that patent's application – "the '453 application"). Since the '717 patent is a continuation of the '821 patent, Lutron asserted that the '717 patent should also be declared invalid, even though the '717 patent's application disclosed this information during its prosecution. In effect, Lutron argued that the invalidity of the parent patent (the '821 patent) "infected" the enforceability of later patents.

Specifically, Lutron argued that some of the claims of GeigTech's patents were anticipated and obvious in light of figures in a brochure published by HeAVi, LLC (a company affiliated with Geiger) in 2010, which apparently described several products that GeigTech claimed in its '717 patent. Lutron claimed that "the brackets pictured in the published HeAVi 2010 brochure are virtually an exact match" to figures depicted in both the '821 and '717 patents. Since the HeAVi brochure was published in 2010, and the brackets advertised in the brochure were available for sale at least as early as 2011, it was prior art that GeigTech failed to disclose during the prosecution of the '821 patent. Lutron also argued that GeigTech concealed prior art that was obvious in other industry catalogs published by Somfy Systems, Inc. in 2003 and 2009, which had described elements similar to the "key" and "pin" elements claimed by the '821 patent. Lutron attached images of the drawings in the HeAVi and Somfy publications that it states matched the figures included in GeigTech's patents.

On August 30, 2019, GeigTech filed a motion to dismiss Lutron's counterclaim that had alleged unenforceability due to inequitable conduct, and also asked the Court to strike any affirmative defenses in Lutron's answer and counterclaim associated with those arguments. GeigTech argued that because both the Somfy materials and the HeAVi materials were disclosed

during the prosecution of the '717 patent, there was no inequitable conduct even if an earlier application process had omitted certain information. Put differently, GeigTech insisted that there is no "infectious unenforceability" that somehow taints the '717 patent.

But on January 2, 2020, before the Court could decide the motion to dismiss, Lutron notified the Court that it had filed two petitions for post grant review ("PGR") with the PTAB. The PGRs challenged the validity of the claims of GeigTech's '717 patent which, if sustained, could invalidate the patent. The parties asked for a stay of the litigation until a final PTAB decision. The Court granted that stay on January 28, 2020.

On August 26, 2020, the parties filed a proposed stipulation asking the Court to consolidate the trade dress case with the '717 patent litigation, given the significant overlap of the evidence concerned in both cases. The parties informed the Court that the PTAB had denied Lutron's first PGR challenging the '717 patent but had granted the second PGR and was instituting a fuller review of those claims. The parties asked the Court to keep the stay of both lawsuits in place until the PTAB finished its full review. (Case No. 18-cv-5290, Dkt. No. 126).

The Court granted the proposed order and consolidated and stayed both litigations on September 10, 2020. (Case No. 18-cv-5290, Dkt. No. 128).

3.  The Present (Third) Litigation

Presently before the Court are motions pending in GeigTech's *third* lawsuit against Lutron, this time asserting infringement of yet another one of GeigTech's patents.

GeigTech filed the present lawsuit against Lutron on December 3, 2020 – less than three months after the first two cases had been consolidated and stayed. GeigTech's complaint alleges that the Palladiom System's end and center brackets used to secure the system to a support surface (in contrast to the jamb brackets that allegedly infringed the '821 patent in the trade dress case) –

infringes the '872 patent. GeigTech's complaint is extremely similar to those it filed against Lutron in the previous two litigations, with many of the same pictures of the Palladiom System being used as descriptions for how the product allegedly infringes on GeigTech's patent.

On January 15, 2021, Lutron filed an answer and countercomplaint against GeigTech, asserting twelve affirmative defenses and four counterclaims. Of relevance here is Lutron's third counterclaim (which GeigTech has moved to dismiss), which seeks a declaratory judgment that the '872 patent is unenforceable because GeigTech engaged in inequitable conduct with respect to the patent, and because of the doctrine of equitable intervening rights. (Dkt. No. 25 at ¶¶ 13–18).

Lutron argues that GeigTech engaged in inequitable conduct by deliberately failing to name an inventor of the '872 patent in the patent's application: a man named Matthew Taylor, who had worked as an architect on the same construction project as Geiger in 2010, and who has declared (in an affidavit) that he was the one who originally provided Geiger with the idea and sketches of the brackets claimed in the '872 patent. (Decl. of Matthew Taylor, Dkt. No. 40, Ex. 1).

Lutron also makes the same arguments it did in the previous two litigations: that GeigTech engaged in inequitable conduct by failing to disclose prior art references – such as the 2010 HeAVi brochure and the Somfy catalogs – that would have doomed the application of the parent '821 patent had the PTO been aware of it at the time. (Dkt. No. 25 at 11–13).

Currently pending before the Court are two motions filed by GeigTech: (1) a motion for a preliminary injunction to enjoin Lutron from making, marketing, or selling its Palladiom products – the second such request for a preliminary injunction in this saga; and (2) a motion to dismiss Lutron's third counterclaim – the claim for declaratory judgment of unenforceability of the '872 patent – as well as to strike that counterclaim's related affirmative defenses (defenses two, nine, and twelve).

## II.     DISCUSSION

### A. GeigTech's Motion for Preliminary Injunction is Denied; GeigTech has not Shown a Likelihood of Success on the Merits

The grant of a preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain one, a movant must demonstrate four things: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id*. at 20; *see also Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 620 (S.D.N.Y. 2010) (noting that a preliminary injunction analysis "requires the use of the Supreme Court's four-factor test in every case."). The motion must be denied if the movant fails to demonstrate any one of these elements.

In a patent-infringement case, a plaintiff seeking a preliminary injunction "must show that it will likely prove infringement, and that it will likely withstand challenges, if any, to the validity of the patent." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009). "In other words, if [Lutron] raises a 'substantial question' concerning validity, enforceability, or infringement (*i.e.,* asserts a defense that [GeigTech] cannot show 'lacks substantial merit') the preliminary injunction should not issue." *Genetech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997) (quoting *New England Braiding Co. v. A.W. Chesterton Co.*, 970 F.2d 878, 883 (Fed. Cir. 1992)). "The burden on the accused infringer to show a substantial question of invalidity at the preliminary injunction stage is lower than what is required to prove invalidity at trial. Vulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial." *Tinnus Enters., LLC v. Telebrands Corp.*, 846 F.3d 1190, 1205 (Fed. Cir. 2017) (cleaned up).

GeigTech asserts that infringement should be clear from comparing the claims of the '872 patent to the Palladiom System. It has attached a representative claim chart noting the similarities

11

between the Palladiom System's bracket setup with the claims described in the '872 patent. It also provides a declaration from James Geiger, the founder of GeigTech, who opines that the Palladiom System infringes the '872 patent. (Geiger Decl., Dkt. No. 22 at ¶¶ 21–41).

But the fact of the matter is, this case is simply a continuation of the first two cases, in which the Court has already denied one motion for a preliminary injunction. Lutron raises several arguments that it claims raise a "substantial question" as to the validity of the '872 patent, which would preclude the grant of a preliminary injunction, and GeigTech has not shown that Lutron's arguments "lack substantial merit." As a result, its motion for a preliminary injunction must be denied.

1.  The Kirsch Patent Raises a Substantial Question About the Obviousness of the '872 Patent

First, Lutron argues that claims 1–4 of the '872 patent are fully anticipated (and thus made obvious) by U.S. Patent No. 1,476,160, which was granted to Charles W. Kirsch ("the Kirsch patent") on December 4, 1923. The Kirsch patent is entitled "Window Shade Roller Fixture" and contains figures similar to those proposed in the '872 patent, as shown below:





13

While the similarity of the figures, alone, is not enough to raise a "substantial question" as to whether the '872 patent is anticipated by the Kirsch patent, it does create an inference that what GeigTech claims was its invention was already contemplated and commonplace before it applied for the patent. The critical question is whether the claims described in the '872 patent are essentially the same as those asserted (and depicted) in the Kirsch patent.

Lutron argues that they are. For example, it notes that Claim 1 of the '872 patent describes "A fastening device for supporting a roller window shade assembly," which is the same as the device shown in Figure 1 of the Kirsch patent, comprising a device that fastens the roller window shade to a support surface. (*See* Dkt. No. 34, Ex. 1 at 1). Similarly, the '872 patent's claims regarding "a bracket configured to be carried by a support surface" of which "a side included in the bracket configured to engage the support surface . . . extends away from the support surface to carry a roller window shade assembly" is exactly what is shown in Figure 2 of the Kirsch patent. Lutron also observes how the Kirsch patent's figures have areas where electrical wires can be obscured by the brackets and the shade structure. And although the Kirsch patent does not explicitly mention electrical wiring, Lutron notes that there are several areas within the figures where wiring can fit through passages, which would obscure them – precisely what is contemplated by the '872 patent.

GeigTech counters by arguing that the '872 patent *explicitly* claims a "passage included in the bracket configured to receiving an electrical wire extending from the support surface through the bracket," and that this is a unique limitation that Lutron cannot simply explain away by adding its own commentary to figures included in old patents. GeigTech points to the PTAB rejection of a similar argument when it denied one of Lutron's two PGR petitions against the '717 patent. In those proceedings, Lutron had proffered figures from another publication (not the Kirsch patent)

that it claims showed that the bracket system was already contemplated in prior art. But the PTAB held that Lutron's commentary on the patent's figures were not supported by the drawings and rejected the claim. (*See* Dkt. No. 54, Ex. 35 at 23). GeigTech also faults Lutron for apparently construing the term "passage" differently when comparing the '872 patent with the figures in the Kirsch patent.

But GeigTech's arguments are not dispositive and on this motion for a preliminary injunction are not persuasive.

First, GeigTech's reliance on a PTAB decision in the PGR addressing the '717 patent is misplaced. Lutron did not rely on the Kirsch patent as prior art before the PTAB, and the figures submitted to this Court for comparison resemble each other far more closely than do the figures about which the PTAB opined. The figures the PTAB considered are shown below (Dkt. No. 54, Ex. 35 at 15, 17):



These figures are far less similar to the figures in the '717 patent than the Kirsch patent's figures are to the figures in the '872 patent. Critically, the Kirsch patent includes Figure 2 – the one specifically depicting a bracket where wiring could theoretically be run through, and which is extremely similar in resemblance to Figures 1 and 2 outlined in the '872 patent. This renders the Kirsch patent fundamentally different from anything the PTAB considered. Moreover, the figures

the PTAB considered did not specifically focus on the *brackets* of the roller shade system, which is the critical "inventive" concept that GeigTech states as an advancement. Thus, GeigTech's reliance on the PTAB's decision is unpersuasive.

Second, the main aspect of the '872 patent that GeigTech argues is *not* contemplated by the Kirsch patent is the passage for electrical wiring. But the fact that the Kirsch patent does not explicitly mention electrical wiring passing through gaps in the bracket does not mean that the concept is not otherwise obvious. A patent is invalid "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103. To be non-obvious, an improvement must be "more than the predictable use of prior art elements according to their established functions" and more than "the mere application of a known technique to a piece of prior art ready for the improvement." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007).

Here, the figures from the Kirsch patent suggest that it could have been obvious to those of ordinary skill in the art that wires could be passed through the gaps in the brackets so that they could be obscured. When one looks at Figures 1, 2, and 3 of the Kirsch patent, there are clear areas where parts of the bracket are hidden from view. Thus, it is at least "predictable" that – if a shade system were to be automated – wires that are run through the brackets could also be hidden from view. "[W]hen a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result." *Id*. at 416. At this stage – where GeigTech is requesting a preliminary injunction to prevent Lutron from selling *any* Palladiom products – it is the Court's view that the

Kirsch patent raises a "substantial question" as to the '872 patent's validity as to whether the claims contemplated were obvious at the time of filing.

Obviously, this conclusion does not make it final that the '872 patent is invalid for obviousness or that GeigTech will fail to prove its claim of infringement later in the litigation. It is simply that GeigTech has not met the high bar for the demonstrating that Lutron's argument based on the Kirsch patent "lacks substantial merit."

2. Matthew Taylor may be a Co-Inventor of the '872 Patent

Lutron also argues that the '872 patent is invalid due to inequitable conduct because GeigTech deliberately failed to name a co-inventor of the patent. "[C]ourts have historically held that if a patent does not reflect its true inventorship, it is invalid." *Egenera, Inc. v. Cisco Sys., Inc.*, 972 F.3d 1367, 1376 (Fed. Cir. 2020). "Accordingly, if nonjoinder of an actual inventor is proved by clear and convincing evidence . . . a patent is rendered invalid." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1349 (Fed. Cir. 1998).

Since the standard for defeating a motion for preliminary injunction requires only that the alleged infringer show that the patent is *vulnerable* to an invalidity defense, and not actually prove that it is invalid at this stage, Lutron need only show that there is a substantial question of inventorship. It has done so.

Lutron has submitted a sworn affidavit by Matthew Taylor, who avers that he is a co-inventor of the bracket system claimed by the '872 patent. (Dkt. No. 40, Ex. 1). Taylor is an architect from South Carolina, who was the architect on a very large construction project located on Hilton Head Island from 2009 through 2012 (the "Charbon project"), on which James Geiger also worked. (*Id*. at ¶ 2). The project was large and involved shading for more than 100 windows.

Taylor claims that it was he, not Geiger, who created the roller shade system that ultimately became the '872 patent. He states (*Id*. at ¶ 6):

> The shade requirements, which I created, were that the roller shades, including their mounting brackets, would be exposed – with no valances to cover them. The brackets therefore needed to be clean in design to complement the existing details I had designed for the project, not just stamped sheet metal. In addition, the brackets, like all other facets of this job, would need to use blind fasteners and conceal electrical supply (electrical wiring). These requirements were not the idea of James Geiger or anyone with HeAVi [Geiger's company].

Taylor states that as the architect responsible for designing the window shades, he had specific requirements for how the shading system was set up. Geiger was involved in the Charbon project to help provide audio/visual and whole-home-automation assistance, and thus "became involved in the search for a shade system based on [Taylor's] requirements." (*Id*. at ¶ 11). According to Taylor, he and Geiger then engaged in an iterative process to find the right types of materials, shades, and brackets to create the system that Taylor envisioned, which "was to mill a 1/4"-3/8" thick round, aluminum disk to be mounted directly to the window jamb at either end of the shade. The perimeter surface of the disk-shaped bracket would be visible as an expressed structural detail," and "The circular perimeter would match the circular shape of the roller shade, helping to maintain a clean, attractive look." (*Id*. at ¶ 9).

In a December 15, 2010 email, Geiger sent Taylor a PDF of "Bracket Drawings" that looked similar to what ultimately became the figures included in the '872 patent. Taylor said it "concerned" him because Geiger had put HeAVi's copyright over the drawings even though they were Taylor's idea. (*Id*. at ¶ 19). Taylor expressed his discomfort at Geiger's taking ownership of the drawings, but affirms that he "let the issue go" to focus on the project. Taylor asserts that he "did not become aware of patents that James Geiger had obtained for exposed brackets until this year [2020]" and that Geiger "never discussed his patent application with me and never sought or

obtained my permission to seek a patent on any aspect of my ideas that went into the design of the brackets used in on the Charbon project." (*Id.* at ¶ 23).

Taylor's affidavit – which he made under oath and penalty of perjury – creates a question of fact as to the inventorship of the '872 patent, thus rendering it vulnerable to invalidation. It is a question of fact that only the ultimate trier of fact can solve.

GeigTech argues that inventorship requires "more than just a general goal or research plan, and instead requires a definite and permanent idea of an operative invention, including every feature of the subject matter to be patented." *Ferring Pharm. Inc. v. Serenity Pharm., LLC*, No. 17-cv-992 (CM), 2020 WL 492658, at *62 (S.D.N.Y. Aug. 21, 2020). It thus argues that Taylor's "self-serving" affidavit, which talks only generally about the idea of exposed bracket roller shades, is not the same as inventorship, because the affidavit makes no reference to the specific claims of the '872 patent or how Taylor came up with those unique limitations and ideas. Moreover, Geiger submitted the application that ultimately became the '872 patent in 2012 – almost two years after Taylor's discussion about the brackets with Geiger.

But while it remains to be seen whether Taylor truly *is* an inventor of the '872 patent, at this stage of the litigation, Lutron's burden is not to definitively prove that he is – only that there is a substantial question over inventorship that precludes a preliminary injunction. The Court has no reason to find Taylor's affidavit incredible on its face; Geiger himself has affirmed that he worked on the Charbon project with Taylor, and that the two had collaborated on certain aspects of the project. (*see* Declaration of James Geiger, Dkt. No. 55 at ¶¶ 5–8). There is a "he-said-he-said" over how the ideas and designs of the '872 patent came to be, and the Court cannot dismiss such a serious issue out of hand. There must be factual development (depositions of Mr. Taylor, if

necessary) to determine the extent of his involvement in the generation of the concept. That is sufficient to defeat a motion for preliminary injunction.

**********

When the validity of a patent is challenged at such an early stage of the litigation, " 'the burden is on the challenger to come forward with evidence of invalidity,' *which the patentee must then rebut.*" *Tinnus*, 846 F.3d at 1205 (quoting *Titan Tire*, 566 F.3d at 1377–78) (emphasis added). Lutron has presented two pieces of evidence – the Kirsch patent and the affidavit of Matthew Taylor – that raise substantial questions of the validity of the '872 patent. GeigTech has certainly raised questions about both pieces of evidence, but at this stage of proceedings it has rebutted neither. GeigTech has thus failed to carry its burden of establishing that the "extraordinary remedy" of a preliminary injunction is required because it was "unable to establish that the alleged infringer's invalidity defense 'lacks substantial merit.' " *Titan Tire*, 566 F.3d at 1378.

Because GeigTech has failed to demonstrate a likelihood of success on the merits of its patent claim, there is no need for the Court to analyze any other element of the *Winter* formulation: the motion for a preliminary injunction fails on that ground alone.

### B. The Remainder of this Case is Stayed Until Resolution of the PTAB Decision Concerning the '717 Patent

GeigTech also moves to dismiss one of Lutron's four counterclaims – specifically, its third counterclaim which asks the Court to declare the '872 patent unenforceable because of inequitable conduct and the equitable intervening rights doctrine. Lutron's third counterclaim relies on three of its affirmative defenses: (1) inequitable conduct for failing to name Matthew Taylor as a co-inventor of the '872 patent (Ninth Defense); (2) inequitable conduct for failing to disclose certain prior art materials to the PTO during the prosecution of the '821 patent – a predecessor to the '872 patent (Twelfth Defense); and (3) unenforceability of the '872 patent because of the equitable

20

intervening rights doctrine. GeigTech moves to dismiss the entire counterclaim but makes arguments against only two of Lutron's defenses: (1) inequitable conduct for failing to disclose prior art materials to the PTO; and (2) the equitable intervening rights doctrine. (*See* Dkt. No. 48 at 2).

Lutron argues that the '872 patent is unenforceable because GeigTech failed to disclose material information that would have altered the PTO's evaluation of the '821 patent (a predecessor to both the '717 patent and the '872 patent) during the prosecution process. This information includes the prior publications by Somfy and the HeAVi brochure from 2010 – which have now been discussed at length – which Lutron claims described obvious prior art that would have invalidated the '821 patent had they been disclosed. (Dkt. No. 25 at 12).

The arguments Lutron makes in this regard are the same arguments that it made in its counterclaim in the '717 patent litigation. In that case, Lutron argued that the '717 patent – which is also continuation of the '821 patent – was unenforceable because GeigTech "knowingly concealed the HeAVi 2010 brochure and related public use and/or sales from the Examiner while pursuing and being awarded claims intended to read directly onto the brackets disclosed in the '453 application" and "committed inequitable conduct by concealing each of [the] Somfy [publications], and their knowledge about the prior-art products" from the Examiner. (Case No. 19-cv-4693, Dkt. No. 20 at 14, 16). These are the same exact arguments that Lutron now makes against the enforceability of the '872 patent.

And in the earlier litigation, GeigTech also filed a motion to dismiss Lutron's counterclaim, making effectively the same argument that it does now – that there was no inequitable conduct because the Somfy and HeAVi materials were disclosed in the prosecution of the patent-in-suit, thereby "curing" whatever misconduct could possibly have occurred earlier. (*See* Case No. 19-cv-

4693, Dkt. No. 27). The motion to dismiss Lutron's counterclaim in the '717 patent litigation is currently still pending, as that case has been stayed – at the request of the parties, I might add.

And at the parties' request, the Court also consolidated the '717 patent litigation with the trade dress case and stayed both of them, because the parties stipulated that "whatever the final outcome of the PTAB's final written decision may be, the parties agree it will provide greater clarity to the issues the Court will eventually try in the requested consolidated case. These issues include the identity of any patent claims that need to be tried, the scope of any such claims, and the availability or unavailability of various invalidity grounds in light of the estoppel provision of 35 U.S.C. § 325(e)." (Case No. 19-cv-4693, Dkt. No. 36). The same reasons apply to this case, especially as the '872 patent is a continuation of the '717 patent and recites (to this Court's view) very similar claims. Moreover, given the identity in the arguments made by the parties regarding Lutron's argument of unenforceability, any decision on the merits of these arguments will likely be applicable to both this litigation and the '717 litigation. Thus, it would be unwise to issue a decision in one case before the other.

I confess that I am tired of waiting on the PTAB, and am uninterested in having more and more lawsuits filed, and more and more motions made. I would like to get to claim construction (in accordance with my patent rules, claim construction precedes any litigation on the merits) and then turn to the validity of the patents in suit.

So, I am *sua sponte* consolidating this case with the two earlier cases and imposing a stay that will last no longer than the end of this calendar year. If before then the PTAB issues a ruling on what is left of Lutron's challenges to the '717 patent, the stay will automatically expire. If the PTAB has not ruled by December 31, we will simply go ahead with litigation over the merits. Enough really is enough.

### III.    CONCLUSION

The motion for a preliminary injunction is denied. The motion to dismiss Lutron's counterclaim is also denied, albeit without prejudice to renewal once the stay of these cases expires. However, the odds that the Court is going to grant the motion to dismiss any of the affirmative defenses are slim; it appears to me that this case is going to be litigated on the merits. If I were GeigTech, I would not waste my client's money on such a motion.

The Clerk of Court is respectfully directed to consolidate this case with Case No. 18-cv-5290, and to remove the motions at Dkt. Nos. 20 and 31 from the Court's list of open motions.

If PTAB issues a decision on the '717 patent prior to December 31, 2021, the parties should inform the Court and I will set a schedule for briefing any remaining claim construction issues. If PTAB does not issue its decision on the '717 patent by that date, the stay will expire, and the Court will set a briefing schedule.

This is the decision and order of the court. It is a written decision.


Dated:  August 12, 2021
New York, New York

_____

United States District Judge


BY ECF TO ALL COUNSEL

23